```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
TAMMY MORSE,

                        Plaintiff,             05-CV-6318

              vs.                              DECISION
                                               and ORDER
THE CORNING INCORPORATED PENSION
PLAN FOR HOURLY EMPLOYEES,

                        Defendant.
_____
```

## INTRODUCTION

Plaintiff Tammy Morse ("plaintiff" and/or "Morse"), former employee of Corning Incorporated brings this action against the defendant Corning Incorporated Pension Plan For Hourly Employees ("defendant" and/or "Corning") pursuant to the Employee Retirement Income Security Act ("ERISA") claiming that the defendant wrongfully denied her application for total and permanent disability benefits.

Defendant moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on grounds that the Plan Administrator's decision to deny benefits was neither arbitrary nor capricious and thus, the decision is entitled to deference from the Court. Plaintiff cross-moves for summary judgment.

## BACKGROUND

Plaintiff's complaint alleges a violation of ERISA in connection with the defendant's decision to deny plaintiff disability benefits under the Corning Pension Plan for Hourly Employees (the "Plan"). Under the Plan, Corning provides a disability pension to employees who become totally and permanently disabled ("TPD benefits"). On June 12, 2006,

Corning filed a motion for summary judgment against Morse. On August 3, 2003, Morse filed a cross motion for summary judgment.

**A.     Corning's Pension Plan**

The Plan provides pension benefits to retired Corning employees and TPD benefits to those employees who can satisfy the eligibility requirements. Article 4.3 of the Plan states that an employee is deemed to be totally and permanently disabled "when on the basis of medical evidence satisfactory to the Pension Committee he is found to be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long, continued and indefinite duration."

Article 5.9 of the Plan states that the Pension Committee has "the discretion to ... determine all questions relating to ... the eligibility of persons to receive benefits hereunder." Corning states that the Pension Committee was subsequently renamed the Benefits Committee under an amendment to the Plan. Plaintiff however, argues that the amendment merely indicates "that there is hereby created a Benefits Committee" and the Plan does not state that the Pension Committee was renamed the Benefits Committee. Moreover, the Summary Plan Description ("SPD") states that "[t]he plan administrator has been delegated exclusive authority to review and administer benefit claims appeals. The plan administrator has the right to interpret the provisions of the plan and the administrator's decisions are final and conclusive." The SPD also states that the plan administrators for all

of Corning benefit plans "have the complete authority, in their sole and absolute discretion,... to decide the eligibility for, and the extent of, benefits under the Plans..."

Article 5.12(b) of the Plan states that "named fiduciaries ... shall have the right to designate persons other than named fiduciaries to carry out fiduciary responsibilities ... under the Plan." On July 13, 2001, the Benefits Committee unanimously approved the delegation of its duties as claims administrator for TPD benefits under the Plan to CORE, INC. ("CORE"). CORE's duties as claims administrator were performed by its Peer Review Analysis ("PRA") division. Corning claims that on October 10, 2002, MCMC, LLC ("MCMC") acquired PRA from CORE and became the Plan's claim administrator for TPD benefits. Plaintiff argues that absent a specific delegation in accordance with the underlying Plan documents by the Benefits Committee, not CORE, all determinations made by MCMC are subject to de novo review.

The amendment to the Standard Services Agreement ("SSA") entered into between Corning and CORE dated January 1, 2002 provides that, "CORE hereby agrees to act as fiduciary under the specific employer Plan...,to make findings of fact, and to decide all issues presented. It is intended that, in carrying out its duties under the preceding sentence, CORE will have complete and Unfettered discretion, and that any determination ... by CORE may be reversed or overruled ... only if such determination ... is arbitrary and capricious. The independent specialist physician(s) will be selected by CORE. Such physician(s) will be employed by, or under contract with, CORE... C. The independent

specialist(s) ... will review documentation received with the case... F. Should additional information be needed, CORE's reviewer may contact the patient's provider to request the additional information where CORE considers such information necessary or potentially useful... G. The independent specialist(s)... will review available medical records, will review any additional information obtained from patient's provider, and will write an independent rationale in support of his/her final decision... H. A determination letter will be written and mailed by CORE to the Plan participant or beneficiary. The letter will include the final decision, the specific reasons for the final decision written in a manner calculated to be understood by the claimant, as well as specific references to any Plan provisions on which the decision is based...."[1]

### B. Denial of Morse's Application

Corning employed Morse from March 1979 through November 21, 2003 as a Material Control Operator. In connection with her employment, Morse is a participant in the Plan. Morse submitted a Statement of Claim for Total and Permanent Disability Benefits dated March 17, 2004 ("Statement of Claim") to Corning. In her Statement of Claim, Morse indicated that she stopped working on November 21, 2003, the same day she claims she became totally disabled and unable to work. Further, Morse stated that she was being treated by Dr. Richard Kowalski. Other than stating she had an "illness," Morse did not identify her disability in her application. However, Morse's application included an Attending

---

[1] The SSA also provided as follows: "Assignment. Neither party may assign or delegate responsibilities under this Agreement, except as specifically authorized hereunder, without the prior written consent of the other... Any assignment or delegation attempted in violation of this provision shall be void ...."

Physician's Statement of Functional Capacity signed by Dr. Kowalski and Linda Riner, a Social Worker indicating that Morse had decreased energy and "difficulty focusing [and] concentrating" and that she was unable to work "due to mental health diagnosis."

The report further showed that based on the physician's findings according to the DMS-III multiaxial classification, plaintiff's primary diagnosis was bipolar II disorder (269.89) and secondary diagnoses were panic disorder without agoraphobia (300.01) and depressive disorder NOS (311). Alcohol dependence (303.90) was stated to be in "remission." The report concluded that Morse was totally disabled from any occupation and that she would never be able to resume work activities. Furthermore, Morse wrote in a personal profile accompanying her application that she was taking Prozac (40 mg per day), Risperdal (10 mg per day), and Buspar (10 mg twice per day).

MCMC assigned Dr. Jean Dalpe, a board certified psychiatrist and neurologist, to determine whether Morse qualified for TPD benefits under the Plan. Dr. Dalpe prepared a case report dated April 2, 2004 in which he listed the materials he reviewed and stated that he spoke to Dr. Kowalski as part of his review. In the section of his report entitled "Clinical Summary," Dr. Dalpe stated that Morse was diagnosed with "Major Depressive Disorder, recurrent in remission, Panic Disorder without agoraphobia, and Alcohol Dependence."[2] Dr. Dalpe reported that Dr. Kowalski informed him that he had been seeing Morse for those conditions since 2001 and that Morse was also being treated by Ms.

---

[2] Morse states that nowhere in the statements from her treating psychiatrist and therapist was it indicated that her major depressive disorder was "recurrent in remission." The only reference to remission was to her alcohol dependence disorder.

Riner. In addition, Dr. Dalpe asked Dr. Kowalski why Morse stopped working and quoting from his notes, Dr. Kowalski replied that she has a "continued conflict with [her] superiors at work" and "is angry, feels attacked" and was "concerned about how she is treated on the job." Dr. Dalpe also noted that "[t]he only disabling symptoms [Dr. Kowalski] cited were that Morse 'can't concentrate and now [had] more anxiety attacks.'"

Dr. Dalpe concluded that Morse was not eligible for TPD benefits because there was "no medical justification" for her alleged disability. He further noted that there was no "medical documentation" showing that Morse had any "functional incapacity" and her anxiety appeared to be solely the result of conflict with her supervisor. As a result, MCMC advised Morse that her application for TPD benefits was denied since "there was no medical documentation provided that would indicate functional incapacity" and there was "no medical justification" for the disability. Plaintiff argues that although Dr. Dalpe's report contains no such conclusions, the denial letter asserts "there is residual work capacity to perform any substantial work activities." Defendant concedes that Dr. Dalpe did not use those exact words, however, Corning noted that such a finding was implicit in Dr. Dalpe's conclusion that Morse was "not totally and permanently disabled."

### C. Morse's First Appeal

Following receipt of the denial letter, Morse appealed the decision by letter dated April 5, 2004. In support of the appeal, MCMC received a letter from Morse's treating therapist, Linda Riner dated

April 20, 2004 indicating that "Tammy suffers from symptoms of bipolar disorder, anxiety panic disorder and she has been absent from alcohol since 1995." Ms. Riner also stated that Morse had told her that she "has had symptoms of anxiety and depression all of her life," that she "suffers frequent mood swings and goes through periods of 'hyperactivity' and periods when she spends much of her time on the sofa doing nothing," and that she "has a poor short and long term memory" and "poor judgment." The letter also noted that "Tammy was referred to Big Flats Medical, Hammondsport Out-Patient, EAP, Dr. Lasher and Nancy VanCleave, and currently sees Dr. Kowalski for medication management and [Riner] for ... counseling."

On May 24, 2004, MCMC assigned Dr. Marcus Goldman, who is board certified in psychiatry and neurology/addiction psychiatry, forensic psychiatry and geriatric psychiatry to review Morse's appeal. He prepared a Case Report dated May 24, 2004 in which he recited information about Morse's condition from Ms. Riner's April 20, 2004 letter. In addition, Dr. Goldman spoke with Dr. Kowalski and asked him what Morse's disabling symptoms were. Dr. Goldman concluded that:

> [t]he available data is not supportive of total and permanent disability. No mental illness has been comprehensively detailed or established, rather, the information indicates a chronically impulsive, anxious person. She carries a diagnosis of bipolar disorder yet there are no data to support this diagnosis. It should be noted that there are no attending physician or therapist progress notes and no corroborative information to support the therapist progress notes and no corroborative information to support the therapist's reports of the patient's claims.

Accordingly, "Disability as defined by Plan language cannot be supported at this time." Morse was informed that her appeal was denied

Page -7-

in a letter dated June 3, 2004. Plaintiff argues that the letter did not request that Morse provide any medical records, nor did it indicate that the absence of progress notes was a basis for the denial even though Dr. Goldman observed that there was no corroborative information to support the physician and therapist's reports of Morse's claim.

### D.  **Morse's Second Appeal**

Morse requested that MCMC reverse its denial of her appeal, which included a letter dated June 28, 2004 signed by both Linda Riner and Dr. Kowalski. The report noted that Morse:

> has difficulty with the activities of daily living at home as well as being unable to perform her job. She suffers disturbances in both her eating and sleep patterns. She has difficulty with short term recall, concentration, racing thoughts, and feels sad, paranoid, angry, worthless and hopeless.
>
> Her debilitating anxiety results in lack of life skills and an inability to change. Tammy has had numerous conflicts with coworkers and supervisors. These conflicts have resulted in a history of aggressive behavior in the workplace. Both Tammy and her employer, Corning, Inc. have partnered to keep her employed. Her absenteeism, job performance, and tardiness have been erratic and extensive. Despite years of counseling and medication management by Big Flats Medical, Dr. Tiller of Penn Yan, Dr. Lasher of Corning, Nancy VanCleave of Elmira, Sue Strickland of Rochester, Marion Mieczkowski at Family Services Society of Corning, myself and Dr. Kowalski of Clinical and Social Work and Counseling Service of the Finger Lakes in Elmira, Tammy's condition remains severe enough to impair and prevent her functioning at work and at home.
>
> The likelihood of Tammy recovering sufficiently in the foreseeable future to sustain gainful employment is extremely unlikely based upon her history and current symptology.

In addition, MCMC received an Evaluation of the Residual Functional Capacity of the Mentally Impaired Patient signed by Dr. Kowalski and Ms. Riner prepared in connection with plaintiff's Social Security Disability claim, which simply reiterated information previously provided. On October 22, 2004, the Appeal Board, which was comprised of

a psychologist and two registered nurses considered Morse's appeal. The denial letter stated "[t]here were no progress notes to review. The letter listed some subjective complaints but no objective data. The case lacks the objective medical evidence needed to deem this person disabled." Accordingly, the Appeal Board concluded that Morse was not totally and permanently disabled.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper when "there is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating a motion for summary judgment, courts must draw all reasonable inferences in favor of the non-movant. See, generally, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Defendant has moved for summary judgment on the ground that it is entitled to judgment as a matter of law with respect to the plaintiff's ERISA claim on grounds that the Plan Administrator's decision to deny disability benefits was not arbitrary and capricious, and therefore must be upheld by this Court. The plaintiff has cross-moved for summary judgment on grounds that the Plan Administrator's decision should be subjected to the de novo standard of review because the discretionary authority to determine eligibility for total and permanent disability was not properly delegated. Further, even under the arbitrary and capricious standard, the Plan Administrator's decision to deny disability benefits was unreasonable, fell short of a full and fair review and was not supported by substantial evidence.

## II. **The Plan Administrator's Benefits Determination Is Subject To An 'arbitrary and capricious' Standard Of Review**

### A. **Appropriate Standard Of Review**

When considering an ERISA claim such as this, the Court must first determine the appropriate standard of review to conduct its analysis. The Supreme Court has held that:

> a denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan.

Firestone Tire and Rubber Co., v. Bruch, 489 U.S. 101, 115 (1989).

If a plan grants the plan administrator discretionary authority to determine eligibility, the Second Circuit has held that the arbitrary and capricious standard will be applied. Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249-252 (2d Cir. 1999). Under the arbitrary and capricious standard, a denial of benefits "may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law." Kinstler, 181 F.3d at 249, quoting Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995).

Plaintiff argues that the de novo standard of review applies because Corning failed to properly delegate its fiduciary responsibilities to MCMC in order for MCMC to have the discretionary authority to determine eligibility for total and permanent disability. See Rubio v. Chock Full O' Nuts Corp., 254 F.Supp.2d 413, 421 (S.D.N.Y. 2003) ("for the de novo standard not to be applicable discretionary authority must be explicitly allocated in the Plan to a particularly

named fiduciary - not through subsequent delegations of authority"). Plaintiff concedes that the Plan did permit the Benefits Committee to delegate its responsibilities to a third party, i.e. CORE. However, plaintiff asserts that there is simply nothing in the Plan documents that allow CORE to transfer or delegate the discretionary authority afforded to it by the Benefits Committee to another entity such as MCMC. Even the SSA between Corning and CORE prohibited any further assignment of duties.

Contrary to plaintiff's improper delegation argument, Corning asserts that Rubio is not dispositive. According to Corning, in Rubio, the plan expressly limited the exercise of discretionary authority to two entities: (1) the employer's board of directors; or (2) a committee appointed by the board. The plan did not contain a provision allowing either of those entities to delegate their fiduciary responsibilities. In contrast, here Corning argues that the Plan expressly permits delegation of the duties of the Plan administrator for TPD benefits. Further, contrary to plaintiff's assertions, the SSA specifically permitted either party to assign or delegate any of its responsibilities as long as the assigning party obtained the other party's prior written consent and such consent was not to be unreasonably withheld. While Corning did not consent in writing, Corning and the Benefits Committee plainly knew about and ratified that assignment by their conduct in having MCMC continue to act as the claims administrator for TDP benefits.

Based on case law in the Second Circuit, the governing terms of the Plan, the SDP and the SSA demonstrates the broadness of the terms of the documents. Given such broad terms and well-established cases, it

follows that Corning properly delegated its fiduciary responsibilities, MCMC was appropriately conferred discretionary authority, and thus the defendant's decision denying the plaintiff's TPD claims must be upheld unless it is shown to be arbitrary or capricious. See Firestone, 489 U.S. at 115. Under this deferential "arbitrary and capricious" standard of review, the plan administrator's decision will be upheld if it is rational in light of the plan's provisions. See Kinstler, 181 F.3d at 249.

### B.    Functional Fiduciary Doctrine

Corning asserts that MCMC is a fiduciary under the "functional fiduciary" doctrine. See Winkler v. Metro. Life Ins. Co., 2004 WL 1687202 *2 n.20 (S.D.N.Y. 2004) (Court relied on the doctrine in ruling that MetLife's decision was subject to deferential review). Under ERISA's functional definition of a plan fiduciary, a person or entity does not need a formal delegation of authority or appointment to become a plan fiduciary. 29 U.S.C. § 1002(21)(A). In fact, the Supreme Court has held that "ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan..." Mertens v. Hewitt Assocs., 509 U.S. 248, 262 (1993). Accordingly, a person or entity becomes a "functional fiduciary" simply by performing fiduciary duties or exercising discretion of a fiduciary nature.

Here, defendant contends that MCMC is an ERISA fiduciary because it assumed CORE's fiduciary obligations as of October 10, 2002 and thereafter exercised fiduciary responsibility regarding determinations about eligibility for TDP benefits. Thus, MCMC's decisions as the Plan

Administrator for TPD benefits must be reviewed under the arbitrary and capricious standard. Plaintiff contends that the "functional fiduciary" doctrine is irrelevant because the doctrine only applies to "whether an entity may sue, or be sued, under ERISA as fiduciary and not whether a functional fiduciary is entitled to arbitrary and capricious review." The plaintiff however, supplies no authority to support her view.

### C.   MCMC's Delegation To Third Parties

Furthermore, plaintiff argues that even if MCMC was authorized to act as the claims administrator, it was not permitted to delegate to "third parties" such as MCMC's medical consultants.  This argument is groundless because the final decision was made by MCMC's Appeal Board and not by the reviewing physicians, who provided supporting information. MCMC involved and consulted with physician reviewers at all three stages of the claim and appeal process, but it is the decision of the Appeal Board that is the subject of the Court's review.

### III.  The Plan Administrator's Decision Denying Plaintiff's Application For Benefits Was Arbitrary And Capricious

Under the arbitrary and capricious standard of review, a Plan Administrator's decision to deny benefits will not be overturned unless the decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Fuller v. J.P. Morgan Chase & Co., 423 F.3d 104, 107 (2d Cir. 2005). Here, MCMC's determination was not supported by substantial evidence, and thus, the Plan Administrator's determination should be vacated.

To establish that a Plan Administrator's decision is supported by "substantial evidence," the administrator must demonstrate that the

decision is supported by "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator] ...." Celardo v. GNY Automobile Dealers Health and Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003). There must be more than a "scintilla" of evidence to support the Plan Administrator's decision, but there need not be a preponderance of the evidence, provided the evidence relied upon by the Plan Administrator is reliable. Ceraldo, 318 F.3d at 146 (citing Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir 1995).

Here, the medical evidence submitted by Morse in support of her application demonstrates that she is disabled. Morse submitted treatment records of Dr. Kowalski and therapist Linda Riner. The Attending Physician's Statement of Functional Capacity indicated that Morse had decreased energy and "difficulty focusing [and] concentrating" and that she was unable to work "due to mental health diagnosis." According to the DMS-III multiaxial classification, plaintiff's primary diagnosis was bipolar II disorder and secondary diagnoses were panic disorder without agoraphobia and depressive disorder. The report concluded that Morse was totally disabled from any occupation and that she would never be able to resume work activities. Further, Morse wrote in a personal profile accompanying her application that she was taking Prozac, Risperdal and Buspar.

Morse's treating therapist, Linda Riner also reported that Morse "suffers from symptoms of bipolar disorder, [and] anxiety panic disorder...." Ms. Riner also stated that Morse had told her that she "has had symptoms of anxiety and depression all of her life," that she

"suffers frequent mood swings and goes through periods of 'hyperactivity' and periods when she spends much of her time on the sofa doing nothing," and that she "has a poor short and long term memory" and "poor judgment." The letter also noted that Morse "was referred to Big Flats Medical, Hammondsport Out-Patient, EAP, Dr. Lasher and Nancy VanCleave, and currently sees Dr. Kowalski for medication management and [Riner] for ... counseling."

Further, a letter dated June 28, 2004 signed by both Linda Riner and Dr. Kowalski noted that Morse has difficulty with the activities of daily living at home and being unable to perform her job. She also suffers disturbances in both her eating and sleep patterns, has difficulty with concentration, racing thoughts, sadness, paranoia, anger, and hopelessness. As a result, Morse has had numerous conflicts with coworkers and supervisors, which have resulted in a history of aggressive behavior in the workplace. Moreover, Morse's absenteeism, job performance, and tardiness have been erratic and extensive. It was noted that plaintiff's condition remains severe enough to impair and prevent her functioning at work and at home in spite of years of counseling and medication management by various health professionals and hospital services. Dr. Kowalski and Ms. Riner concluded that the likelihood of Tammy recovering sufficiently in the foreseeable future and sustain gainful employment is extremely unlikely based upon her history.

Despite the substantial medical evidence provided by Morse's treating physician and therapist concluding that she is disabled, MCMC nonetheless found that Morse was not disabled. In doing so, MCMC relied on the reports of two doctors who never examined or treated Morse. One

report was submitted Dr. Dalpe, a consulting psychiatrist and neurologist who rendered his opinion based solely on a review of Morse's medical records and conversation with Dr. Kowalski. Dr. Dalpe however, never met with, examined, or spoke to Morse. Indeed, Dr. Dalpe did not have the benefit of any direct contact with Morse but instead rendered his opinion based solely on information provided by Morse's physicians. Based on that information, Dr. Dalpe concluded that Morse was not eligible for TPD benefits because there was "no medical justification" for her alleged disability. He further noted that there was no "medical documentation" showing that Morse had any "functional incapacity" and her anxiety appeared to be solely the result of conflict with her supervisor.

A second report was submitted by Dr. Goldman, who like Dr. Dalpe, never met with, examined, or spoke to Morse, and did not have the benefit of any personal contact with her prior to rendering his opinion that she was not disabled. Rather, Dr. Goldman based his opinion on a review of the records of Dr. Kowalski, (Morse's treating psychiatrist) who found plaintiff to be disabled because of her psychiatric condition and Linda Riner (Morse's treating therapist). Dr. Goldman concluded that "[t]he available data is not supportive of total and permanent disability. No mental illness has been comprehensively detailed[.]"

Plaintiff cites the Westphal v. Eastman Kodak Co. case in support of her position. Corning distinguishes Westphal asserting that in Westphal the plaintiff had several problems that rendered him disabled including heart disease and manic depression. In addition, Corning contends that in Westphal the plaintiff provided treatment records and

an IME was performed on the plaintiff. Further, Corning states that in Westphal, unlike this case, the Court concluded that the medical evidence submitted by plaintiff "clearly demonstrates that the plaintiff is disabled."

Where the issue of a psychiatric disability is in dispute, it is an abuse of discretion for the plan administrator to rely on the opinions of two non-treating, non-examining physicians to the exclusion of substantial evidence in the record demonstrating that plaintiff is disabled. Westphal v. Eastman Kodak Co., 2006 WL 1720380 *4 (W.D.N.Y. 2006) In the context of a psychiatric disability diagnosis, it is arbitrary and capricious to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient. Id.

There can be no serious doubt that a psychiatric opinion based on a face-to-face interview with the patient is more reliable than an opinion based on a review of a cold, medical record. Id. at 5. The psychiatric treating model requires that a doctor treating a psychiatric patient conduct an interview, and medical examination of the patient. Id. ("Because of the inherent subjectivity of a psychiatric diagnosis, and because a proper diagnosis requires a personal evaluation of the patient's credibility and affect, it is the preferred practice that a psychiatric diagnosis be made based upon a personal interview with the patient.") (citations omitted)

Therefore, in the context of a psychiatric evaluation, an opinion based on personal examination is inherently more reliable than an opinion based on a cold record because observation of the patient is

critical to understanding the subjective nature of the patient's disease and in making a reasoned diagnosis. Westphal, 2006 WL 1720380 at 5. Subtleties in the patient's mannerisms, the nuances that are derived from her speech and gestures cannot be observed and evaluated by the non-examining physician. This is all necessary in the evaluation process and cannot be done in absentia nor by merely evaluating the treating physicians' notes and opinions. Accordingly, it was error for MCMC to rely upon the opinions of two non-treating, non-examining doctors to the exclusion of the remaining substantial evidence in the record in finding that Morse was not disabled.

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is denied, and the plaintiff's cross-motion for summary judgment is granted.

ALL OF THE ABOVE IS SO ORDERED.

                                       s/Michael A. Telesca
                                          MICHAEL A. TELESCA
                                  United States District Judge

Dated: Rochester, New York
       February 23, 2007